# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLEN DAVIS, | ) 1:02-cv-05715-AWI-TAG HC |
| Petitioner, | ) REPORT AND RECOMMENDATION |
| | ) TO DENY PETITION FOR WRIT OF |
| v. | ) HABEAS CORPUS |
| GAIL LEWIS, Warden, | ) (Doc. 1) |
| Respondent. | ) |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## PROCEDURAL HISTORY

Petitioner is in custody of the California Department of Corrections serving a sentence of fifteen years to life, entered on March 25, 1999 pursuant to a judgment of the Superior Court of California, County of Kern, in case number 75408A,  following his conviction by jury of forcible rape (Cal. Pen. Code § 261(a)(2)); forcible penetration with a foreign object (Cal. Pen. Code § 289(a)); assault with intent to commit oral copulation (Cal. Pen. Code §§ 220, 228a); possession of a sawed-off shotgun (Cal. Pen. Code § 12020(a)); and false imprisonment (Cal. Pen. Code § 236). (Clerk's Transcript on Appeal ( "CT") 364-380; 461-462).

Petitioner appealed his conviction to the California Court of Appeal for the Fifth Appellate District ("5th DCA"), in case number F032999.  Petitioner argued that the trial court erred in excluding evidence of two prior incidents of allegedly false reports of rape by the victim; that the trial court erred in excluding evidence of specific instances when Petitioner had honored his partner's wishes not to engage in or to continue with sexual activity; and that the trial court erred in failing to give CALJIC No. 2.01, a circumstantial evidence instruction, as to all counts.  (Doc. 9,

Exh. B).  The 5th DCA affirmed the conviction in an unpublished opinion filed on March 8, 2001.

(Doc. 9, Exh. A).  A petition for review was filed in the California Supreme Court on April 16, 2001.

(Doc. 9, Exh. C).  The petition raised the same grounds for relief as those raised in the Court of

Appeal.  (Id.).  The petition was summarily denied by the California Supreme Court on May 23,

2001.  (Doc. 9, Exh. D).

The instant petition was filed on May 29, 2002.  (Doc. 1).  Respondent's answer was filed on

November 11, 2002.  (Doc. 9).  Petitioner's traverse was filed on February 21, 2003.  (Doc. 15).

## FACTUAL BACKGROUND

The Court adopts the facts as summarized by the 5th DCA, in relevant part, as follows:

The victim, Charlene E., moved to Bakersfield in February or March of 1997.
Newly divorced, she accepted the invitation of a childhood friend to come live in
her garage apartment.  While in Bakersfield, Charlene met the appellant, with whom
she developed a "casual relationship" that included sexual relations on some four or
five occasions.  Charlene returned to Oregon in February 1998, maintaining phone
contact with appellant.  When Charlene needed to return to Bakersfield in July of
1998 to attend to a child custody matter, appellant offered to let her stay at his
townhouse.  After three or four weeks, appellant and Charlene argued, and Charlene
went to stay with a former boyfriend, John Collier.  Before leaving, however,
Charlene stole a check from appellant.  Arrested when she attempted to cash to
forged check the next day, Charlene pled guilty and spent three weeks in jail.

On her release, Charlene returned to Collier's apartment, awaiting arrival of a check
that would allow her to return to Oregon.  After about a week, Collier told Charlene
she would have to leave.  Charlene went to a park to await another former boyfriend
who lived nearby, hoping he would let her stay with him.  Appellant learned of
Charlene's whereabouts, went to the park, and told her he wanted to talk.  Although
embarrassed about what had happened, Charlene agreed to return with appellant to
his townhouse.

At the townhouse, appellant proceeded upstairs to the bedroom.  Charlene followed
him, turned to sit on the bed, and saw that appellant was holding a gun on her.
Telling Charlene this was to be her confession, appellant turned on a video camera.
For approximately the next 40 minutes, appellant confronted and berated Charlene
for stealing the checks, restraining her and pushing her back on the bed on several
occasions.  He finally forcibly unclothed and sexually assaulted Charlene, at one
point holding the gun to her head in response to her continued pleading and
resistance.  Appellant then instructed Charlene to take a shower, after which he
drove her back to the park...After telling her "[Y]ou took something from me and
now I took something from you," appellant dropped her off at the park.

Charlene called Collier, who had difficulty understanding her because of her
emotional state.  Collier drove to the park, took Charlene to a phone, and convinced
her to call 911.  In the tape of the 911 call, the operator has difficulty even obtaining
Charlene's name, although she is able to make clear Charlene was "raped at
gunpoint."

Charlene told responding officers she thought a videotape had been made of the incident. Officers executing a search warrant for the apartment the next morning recovered the videotape from a kitchen cupboard. They also found a semiautomatic handgun under a pillow on the bed, loaded, with the safety off and a bullet chambered. The shotgun was found in a dresser drawer upstairs. Appropriate charges followed.

At trial, Charlene testified that she did not consent to sex with appellant on the night of September 11; she did not offer to have sex with him to atone for the theft, nor were her actions on the tape the result of role-playing in a sexual fantasy. Rather, she testified to being frightened by the gun during the incident. Charlene also testified that when staying with appellant in the weeks prior to the September 11 incident, they were not having sex, nor had they previously ever engaged in "rough" sex involving bondage or weapons. Questioned about her arrest, Charlene admitted lying to the police initially about having forged the check. She also admitted to having had problems with drugs. When the prosecution played an initial segment of the September 11 tape, Charlene confirmed that it depicted her and appellant on that night.

**The September 11 Videotape**

The videotape is approximately one hour long. Although the picture quality is poor in the first few minutes, the remainder is clear. Much of the audio, however, is unintelligible, since appellant often spoke softly and also turned on the television several times. The videotape depicts a graphic and brutal rape.

**The Defense**

Appellant acknowledged he and the victim had been friends, sharing a relationship that included sexual activity, sometimes involving bondage, sex toys, and role-playing. He had videotaped their encounters. On some occasions, Charlene would say no but the sex would continue, depending "[o]n whether she was serious or not." He also noted that Charlene would cry to get her way, sometimes during sex, which he first thought strange but became "numb to" over time. Appellant played a tape of a sexual encounter with Charlene that occurred during her first visit to Bakersfield, in which she said "No," but the sex continued "[b]ecause I know she wanted it." He said Charlene agreed to be taped on that occasion and had sex with him subsequently, including during the weeks she stayed at his apartment before the theft.

On the night of September 11, he testified, Charlene willingly left the park and went to his apartment with him, after asking "[H]ow can I make it up to you?" At the apartment, they sat downstairs and talked, and then Charlene began kissing him. Asked what sort of sex she wanted to have, Charlene said she wanted to "play hard." Appellant retrieved his handgun from upstairs, taking the bullet out of the chamber in front of Charlene: "I made sure she saw it because just so she knew it was empty." They then went upstairs to the bedroom, he turned on the video camera, and the encounter recorded on the videotape ensued. He ensured that the gun's safety was "on the whole time" and never put his finger on the trigger. Charlene's crying and saying "No" during the encounter was acting on her part: "Well, we already knew what we were going to do when we got up there so it was just part of it." On the drive back to the park, appellant told Charlene he did not trust her and did not want to see her again, receiving a "cruel ...wicked eyeball" look for his trouble.

1   Appellant acknowledged that the videotape was an accurate depiction of events the night of September 11 and that he had turned on the television set because he did
2   not want neighbors to hear them.  Regarding Charlene's sexual preferences, appellant observed "[S]he likes to have it taken from her.  She wants you to force
3   yourself upon her."

4   Lynn Turner, the friend who had offered her garage apartment to Charlene in 1997, testified that Charlene paid little, if any, rent, had a drug problem, and brought
5   unsavory companions onto the property.  Turner said that when she confronted Charlene about the latter, Charlene said one of the men, Damon, had forced sexual
6   relations on her.  Charlene also had confided that a man named AD had raped her. In Turner's opinion, Charlene was a "pathological liar" with a reputation for crying
7   to gain sympathy.

8   Appellant's friends Stephanie Stuart and Monica Rodriguez testified appellant was honest and not violent.  Christine Becker, another friend, believed appellant to be
9   honest.  Courtney Holland and Chavonne Benjamin, former girlfriends of appellant, testified he was nonviolent in sexual situations.

10  **Rebuttal**

11
12  Charlene testified that during the earlier "consensual" tape-recorded sexual encounter, she was drunk and unaware she was being taped.

13  (Doc. 9, Exh. A, pp. 2-6).

14  ## DISCUSSION

15  ### I. Jurisdiction

16  Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

17  to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

18  the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

19  375 fn. 7, 120 S.Ct. 1495 (2000).  Petitioner asserts that he suffered violations of his rights as

20  guaranteed by the United States Constitution.  The challenged conviction arises out of the Stanislaus

21  County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a);

22  2241(d).  Accordingly, the Court has jurisdiction over this action.

23  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

24  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

25  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586

26  (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d

27  751, 769 (5th Cir. 1996)), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other

28  grounds by Lindh, 521 U.S. 320, 117 S.Ct. 2059 (holding the AEDPA only applicable to cases filed

after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by the AEDPA.

## II. Legal Standard of Review

Under the AEDPA, a petition for writ of habeas corpus will not be granted unless the adjudication of a state prisoner's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 123 S. Ct. 1166 (2003); Williams v. Taylor, 529 U.S. at 413, 120 S.Ct. 1495; Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2004). The Supreme Court explains that

> [A] state court decision is "contrary to" our clearly established [Supreme Court] precedent if the state court it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or "if the state court confronts a set of facts that are materially indistinguishable from a [Supreme Court decision] and nevertheless arrives at a result different from [Supreme Court] precedent.
> . . .
>
> A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case.
> . . .
>
> The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable.

Lockyer v. Andrade, 538 U.S. at 73, 75 (citations omitted).

### Habeas Review of State Court Questions of Law

Challenges to purely legal questions resolved by the state court are reviewed under 28 U.S.C. § 2254(d)(1). "The question on review is (a) whether the state court's decision contradicts a holding of the United States Supreme Court; or (b) whether the state court, after identifying the correct governing Supreme Court holding, then unreasonably applied that principle to the facts of the prisoner's case. " Lambert v. Blodgett, 393 F.3d 943, 978 (9th Cir. 2004).

The AEDPA denies habeas relief on any claim adjudicated on the merits in state court unless the state court proceeding resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the United States Supreme Court. § 2254(d)(1)'s reference to "clearly established Federal law" means the holdings (not dicta) of the Supreme Court's decisions, at the time of the state court's decision. Lockyer, 538 U.S. at 412. "A state court's decision is 'contrary to' clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases or if the state court confronts a set of facts materially indistinguishable from those at issue in a decision of the Supreme Court and, nevertheless, arrives at a result different from its precedent." Lambert, 393 F.3d at 974 (citations omitted). "The 'unreasonable application' standard captures those cases in which 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id., quoting Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495 (2000). The Supreme Court instructs that in applying the "unreasonable application" standard, a federal habeas court should ask whether the state court's application of clearly established federal law was objectively unreasonable. Williams, 529 U.S. at 413. Thus, a habeas writ cannot issue if the federal habeas court in its own judgment concludes that the state court decision applied clearly established federal law incorrectly;  the application  must also have been objectively unreasonable. Id.

    To determine whether a state court decision is contrary to or an unreasonable application of federal law, the federal habeas court looks to the "last reasoned decision of [a] state court as the basis of the state court's judgment." Powell v. Galaza, 328 F. 3d 558, 563 (9th Cir. 2003) (quoting Franklin v. Johnson, 290 F.3d 1223, 1233 n. 3 (9th Cir. 2002)).  However, when the state court provides no reasoning for its decision, the federal court independently reviews the record to determine whether under the AEDPA,  the state court properly denied habeas relief, focusing on whether the state court's resolution of petitioner's claim was an unreasonable application of clearly established federal law. See Greene v. Lambert, 288 F. 3d 1081, 1088-89 (9th Cir. 2002); Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2002). "Only by that examination may [the federal court] determine whether the state court's decision was objectively unreasonable." Id. at 982.

///

///

**Review of State Court Questions of Fact**

Federal habeas challenges to purely factual questions determined by the state courts are reviewed under 28 U.S.C. §§ 2254(d)(2); "[t]he question on review is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the finding is supported by the record. [F]act-based challenges founded on evidence raised for the first time in federal court are reviewed under § 2254(e)(1); the question on review is whether the new evidence amounts to clear and convincing proof sufficient to overcome the presumption of correctness given the state court's factual findings." Lambert, 393 F.3d at 978; see, e.g., Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029 (2003); Gonzalez v. Pliler, 341 F.3d 897, 903 (9th Cir. 2003).  Thus, under the AEDPA, state court factual determinations are presumed correct in the absence of  clear and convincing evidence to the contrary. In addition, state court decisions which are adjudicated on the merits and based on factual determinations will not be overturned on habeas review under AEDPA unless the decisions were objectively unreasonable in light of the evidence presented in the state court proceedings. Lockyer, 538 U.S. at 75.

The Ninth Circuit Court of Appeals recently interpreted §§ 2254(d)(2) and 2254(e)(1)[1], and held both provisions apply to challenges supported by separate categories of evidence. Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004); Lambert, 393 F.3d at 971-973.  In Taylor, the Ninth Circuit held that the "unreasonable determination" clause of § 2254(d)(2) applies to intrinsic review

---

[1]  §§ 2254(d)(2) and 2254(e)(1) address whether, and to what extent, a federal district court is bound by state court findings on any of the dispositive factual questions presented in a federal habeas petition.  These statutes provide as follows:

(D) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
. . .

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgement of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption by clear and convincing evidence.

of a state court's process, i.e., circumstances in which a petitioner challenges the state court's findings based entirely on the state court record. Id. at 999-1000.  In Taylor, the Ninth Circuit also held that § 2254(e)(1) applies to challenges based on extrinsic evidence, i.e., evidence presented for the first time in federal court. Id.  As explained in Taylor: "[I]t is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision; rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." Id. (citations omitted). Likewise, mere doubt as to the adequacy of the state court's findings of fact is insufficient; "we must be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate. Id.; Lambert, 393 F.3d at 972.

In the event a habeas petition presents no intrinsic challenge to a state court's factual determinations, or if it does, the factual determinations survive an intrinsic review, the factual determinations are then "dressed in a presumption of correctness, which [ ] helps steel them against any challenge based on extrinsic evidence." Id., citing Taylor v. Maddox, 366 F.3d at 999-1000. State court factual  findings "may be over-turned based on new evidence presented for the first time in federal court only if such new evidence amounts to clear and convincing proof that the state-court finding is in error." Id.

**Review of State Court Mixed Questions of Law and Fact**

A mixed question of law and fact is one that requires the application of legal principles to historical and other facts. § 2254(e)(1)'s presumption of correctness is restricted to pure questions of historical fact. Lambert, 393 F.3d at 976. However, "[s]tate decisions applying law to facts are governed by § 2254(d)(1); however, factual findings underlying the state court's conclusions on the mixed issue are accorded a presumption of correctness." Id., citing Jeffries v. Wood. 114 F.3d 1484, 1498 (9th Cir. 1997) (AEDPA "further restricts the scope of federal review of mixed questions of law and fact. De novo review is no longer appropriate; deference to the state court factual findings is."), further citing Rupe v. Wood,93 F.3d 1434, 1444 (9th Cir. 1997) (voluntariness of confession is a legal question not entitled to presumption of correctness but the state court's finding that no threats

or promises were made was "essentially a factual conclusion, which is entitled to a presumption of correctness").

A federal court reviewing a state court decision based on a mixed question of law and fact must "first separate the legal conclusions from the factual determinations that underlies it. Fact-finding underlying the state court's decision is accorded the full deference of §§ 2254(d)(2) and (e)(1), while the state court's conclusion as to the ultimate legal issue–or the application of federal law to the factual findings–is reviewed per § 2254 (d)(1) in order to ascertain whether the decision is 'contrary to, or involved an unreasonable application of, clearly established' Supreme Court precedent." Lambert v. Blodgett, 393 F.3d at 977-978.

## III.  Review of Petitioner's Claims

The instant petition alleges the following grounds for relief:

Ground 1.    The trial court violated Petitioner's Sixth and Fourteenth Amendment rights by excluding two of the victim's prior rape accusations.

Ground 2.    The trial court violated Petitioner's Sixth and Fourteenth Amendment rights by excluding important character evidence.

Ground 3.    The trial court violated Petitioner's Sixth and Fourteenth Amendment rights by failing to give CALJIC No. 2.01.

**Ground 1.      The trial court violated Petitioner's Sixth and Fourteenth Amendment rights by excluding two of the victim's prior rape accusations.**

Petitioner contends that the trial court violated his constitutional rights by excluding evidence of two incidents in which the victim had purportedly told others that someone had raped or sexually assaulted her.  (Doc. 1, p. 5).    Petitioner's claim is without merit.

A.  Defense Evidence Regarding Prior Sexual Assault Allegations.

Prior to trial, and pursuant to California Evidence Code § 782, the defense sought leave to introduce at trial evidence of several prior incidents when the victim, Charlene Eastlick, had purportedly told friends and acquaintances that she had been sexually assaulted.  (CT 70).    At the commencement of a lengthy pre-trial evidentiary hearing, the defense indicated that it would present evidence of six separate prior allegations of sexual assault by the victim.  (RT 4).    Defense counsel summarized the incidents as follows: (1) several members of a co-ed softball team would testify that

the victim had been raped by "most if not all of the men on the softball team"[2]; (2) an incident in April 1997 when the victim charged that Adolphus Williams, whom she met at another bar, had taken her home and raped her (the "Williams incident"); (3) an incident at the home of Robert and Lynn Turner, from whom the victim rented a garage-apartment, in which the victim told the Turners that she had just been raped by two men in the garage (the "garage incident");  (4) a November 1997 claim to the victim's then-boyfriend, John Collier, while at a local bar, that she had been raped by a bar patron named "Damon" six months earlier (the "Damon incident"); (5) an attack on Eastlick by Damon later that night after Collier left her (the "second Damon incident"); and (6) an incident in Oregon in 1997 when, after disappearing from work for several days, the victim returned and indicated that her boyfriend, Tyrone Carr, had held her hostage and raped her (the "Oregon incident").  (RT 4-8).

The defense did not indicate it would prove the prior allegations were false; instead, it intended to rely on the fact that the sheer number of prior sexual assault allegations, all made within the span of two years, made the victim inherently incredible and established a pattern of her making false allegations of sexual assault.  (RT 17).   The Court will summarize the evidence proffered as to each incident and then analyze whether the exclusion of any of these incidents violated Petitioner's right to Due Process.

1.  The Williams Incident.

At the pre-trial hearing, Lynn Turner, who, along with her husband Robert, had leased a garage-apartment to the victim during 1997, testified that shortly after the victim moved into the garage-apartment, she told Turner she had been raped by one Adulfus Williams, whom she had met at a bar called Rocking Rodeo.  (RT 92).  The victim had been hysterical afterward and Turner had contacted the Alliance Against Family Violence to assist her.  (RT 92).  The next night, the victim returned to the same bar.  (RT 95).  Eastlick testified that she had told Collier, a former boyfriend, about the incident on several occasions.  (RT 194).

///

---

[2]The defense withdrew its request to present evidence regarding this incident after being unable to verify that it was anything more than a mere "rumor."  (RT 43-44).

After the hearing, the prosecution withdrew its objection to this evidence because it intended to establish that Collier had confused the Williams incident with the "Damon" incident and that Collier's testimony about the victim's prior rape allegation regarding Damon was merely the result of a misunderstanding and not evidence of a separate rape allegation.  (RT 246).

During trial, the victim, on cross-examination, was asked about the Williams incident.  She testified that when her girlfriend left the Rocking Rodeo early, the victim needed a ride home and Williams offered her one, but then raped her.  (RT 347).  Although the victim later filed a complaint with police and submitted to a medical examination, the prosecutor declined to prosecute.  (RT 348).

When the defense sought to elicit more specific information about the Williams incident, the prosecutor objected and a hearing was held in camera, at the conclusion of which the court refused to permit defense counsel to inquire further into the details surrounding the Williams assault.  (RT 384).  The court based its decision on Evidence Code § 352 and the fact that placing more information before the jury regarding Williams would result in "a second rape trial here involving Mr. Williams and I don't want to get involved in it."  (Id.).

2.  The Garage Incident.

During the pre-trial hearing, Robert Turner testified that the victim lived in the couple's garage-apartment for eight months.  (RT 74).  At some point, Turner told his wife that he wanted the victim to leave because she had men coming to her apartment frequently.  (RT 77).  Lynn Turner had relayed to her husband various conversations she had with the victim in which the victim discussed her sex life.  (RT 82).  Once, while Turner was outside doing chores, he heard two male voices coming from the victim's apartment.  (RT 75).  Turner assumed the men were having sex with the victim because of the nature of the sounds he heard, which included angry statements such as, "Take that, you fucking bitch."  (RT 76).  Subsequently, Turner saw two African-American males leaving the apartment.  (RT 79).  Turner had seen the two before and after this incident.  (RT 77).  Later, Lynn Turner told her husband that the victim had indicated she had been raped by the two men.  (RT 83).

Lynn Turner was a childhood friend of the victim.  (RT 85).  After her husband complained to her about the victim's male visitors, Lynn Turner told the victim, who began to cry and got upset

and apologetic.  (RT 86).  The victim "alluded" to the fact that she had been raped by these men, that she was afraid of them, and that if she did not let them in her apartment they might have hurt her. (RT 87).  Lynn Turner admitted that she could not remember the victim's exact words, but that she had gotten the "impression" that the victim had been raped.  (RT 90).  The victim had told Lynn Turner that one of the men was named Damon and that he had physically abused her.  (RT 91).

During her trial testimony, the victim testified that she lived in the Turner's garage-apartment for three or four months but that Robert Turner did not like the fact that the victim dated African-American men.  (RT 188).  During the summer of 1997 while she was living at the Turner's apartment, Damon, an acquaintance, slapped her around.  (RT 190).

In Lynn Turner's trial testimony, she conceded that the victim had never used the words "rape" or "sexual assault" with respect to Damon.  (RT 531).  She recalled that Eastlick had told her Damon had been physically rough with her but "maybe not raped her."  (Id.).  Indeed, Turner finally acknowledged that, on further reflection, the purported sexual assault by Damon "may have been consensual."  (Id.).

3 & 4.  The Two "Damon" Incidents.

John Collier, a correctional officer at Wasco State Prison, dated the victim for a short time in November 1997.  (RT 149).  Once, Collier and Eastlick went to Sharkey's Bar, where the victim pointed out an individual named Damon.  (RT 150).  Eastlick was tense and shaking and indicated that Damon had done something to her on a prior occasion.  (Id.).  On their second visit to the same bar, Collier testified that Damon was once again there.  (Id.).  At some point, Eastlick told Collier that, as they had walked through the crowd in the bar, Damon had struck her in the back.  (RT 150).

When the couple went outside, Collier confronted Damon, who denied punching the victim. (RT 151).  When Collier tried to console the victim, she told him that he had done something to her on a prior occasion, and when Collier inquired further, the victim said Damon had raped her.  (RT 152).

Collier took Eastlick home and then returned to his own residence; however, when he arrived, Eastlick had already left a telephone message asking him to come back to her residence immediately.  (RT 153).  When Collier arrived at the victim's residence, the front door was open, the

1   screen was open, and the victim was lying on the floor with her ripped undergarments nearby. (RT

2   154). She told Collier that Damon had come to the back door, had entered, and physically assaulted

3   and threatened her if she told anyone else about what had happened previously. (RT 154). Collier

4   called the police, but when they interviewed the victim, she was "really dazed" and could only

5   mumble answers to officers. (RT 155).

6          Eastlick testified that the incident at Sharkey's and the subsequent attack by Damon

7   happened essentially as Collier had described. (RT 190-198). However, Eastlick denied ever telling

8   Collier that Damon had raped her; in fact, he had physically assaulted her and that was why she was

9   afraid of him. (RT 194). She testified she had told Collier about a previous rape by Adulfus

10  Williams, implying that Collier may have confused the two incidents. (RT 194).

11         At trial, the victim again denied ever telling Collier or the Turners that Damon had sexually

12  assaulted her, insisting that the assaults by Damon had been physical only. (RT 345-346).   In his

13  trial testimony, Collier never testified that the victim told him she had been sexually assaulted by

14  Damon on the night they went to Sharkey's Bar; moreover, although he recalled the victim telling

15  him that Damon had raped her on a prior occasion, he admitted that it was possible she had been

16  referring to the Williams incident. (RT 480; 482).

17         5.   The Oregon Incident.

18         Tammy Buttner lives in Portland, Oregon and works at an Albertson's grocery store where

19  the victim had worked. (RT 112, 114). At some point in the summer of 1998, the victim did not

20  come to work for three or four days. (RT 114). When the victim finally came to work, she told

21  Buttner that her boyfriend had held her against her will. (RT 116). The victim did not tell Buttner

22  that she had been sexually assaulted by the boyfriend. (RT 117). Later, Buttner helped the victim

23  obtain a restraining order against the boyfriend and also helped her remove her belongings from his

24  residence. (RT 117).

25         A defense private investigator, Harlin Hunter, testified that he had gone to Oregon to

26  interview Buttner, who had related the Oregon incident to him. (RT 126-127). At that meeting,

27  Buttner told Hunter that the victim had told her she had been sexually assaulted by the boyfriend

28  while she was held against her will. (RT 128). Hunter kept no notes of his interview, he obtained no

1   police reports or court documents from Oregon, and he prepared no written report of the

2   investigation.  (RT 129-130).  Instead, he testified entirely from memory.  (RT 129).

3          The victim testified that she and Buttner had met at work and were best friends.  (RT 183).

4   In the summer of 1998, the victim had a boyfriend, Tyrone Carr, that Buttner did not like.  (RT 183).

5   Carr, for his part, did not like Buttner or the victim's other friends and wanted her to get another job.

6   (RT 184).  During that summer, Carr kept the victim at home for three or four days, refusing to let

7   her go to work; although Carr abused her physically during this episode, he did not sexually assault

8   her.  (RT 184-186).

9                     B.   The State Court's Rulings On The Proffered Evidence.

10         As mentioned, the prosecution withdrew any objection to the admission of the fact of the

11  Williams allegation of sexual assault, and the defense withdrew its request to admit evidence of the

12  softball team incident.  The trial court found that the allegations purportedly made to the Turners and

13  to Collier regarding Damon all referred to the same incident and that the "garage incident" was not a

14  separate rape allegation from the first "Damon" incident.  (RT 228).  Although the court never

15  expressly ruled on the admissibility of the "garage incident," testimony was presented at trial by the

16  Turners and Collier regarding the "garage incident" and the first "Damon" incident, both of which

17  apparently involved but a single allegation of assault by Damon, the victim claiming it was physical

18  assault and two witnesses recalling it as sexual assault.  Implicitly, therefore, the state court admitted

19  this evidence.  Testimony was also presented as to the Williams incident, as indicated above.

20         Hence, the defense having withdrawn the softball team incident, the only remaining incident

21  related to the purported sexual assault by Damon after Collier had taken the victim home from

22  Sharkey's Bar, i.e., the "second Damon incident."  However, the defense presented no evidence that

23  the victim ever told Collier, the police, or anyone else that Damon had sexually assaulted her on that

24  occasion.  Accordingly, and contrary to both the Petitioner's and Respondent's assertions, of the

25  original six incidents offered by the defense, the *only* incident of purported sexual assault that was

26  actually excluded by the trial court was the Oregon incident.

27  ///

28  ///

C.  The Exclusion Of The Oregon Incident Did Not Violate Due Process.

As mentioned previously, under the AEDPA, habeas relief will not be granted unless the adjudication of a state prisoner's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).  The strongest source of clearly established law implicating Petitioner's claim is Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142 (1986).  Although addressing the exclusion of the circumstances of a defendant's confession, the Supreme Court in Crane nevertheless reaffirmed the general principle that criminal defendants have a "fundamental constitutional right to a fair opportunity to present a defense." Id. at 687 (citing California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528 (1984)).   As Justice O'Connor observed:

> "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment,
> ...or in the Compulsory Process or Confrontation clauses of the sixth Amendment,
> ...the Constitution guarantees criminal defendants "a meaningful opportunity to
> present a complete defense."

Id. at 690 (citing Trombetta, 467 U.S. at 485). (Citations omitted).

"A state court's evidentiary ruling is grounds for federal habeas corpus relief only if it renders the state proceeding so fundamentally unfair as to violate due process." Bueno v. Hallahan, 988 F.2d 86, 87 (9th Cir. 1993)(per curiam); see also Estelle v. McGuire, 112 S.Ct. 475, 480 (1991) (reemphasizing that federal habeas court may not reexamine state court determinations on state law questions.).  The Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly.  See McGuire, 112 S.Ct. at 482.  "To evaluate whether exclusion of evidence reaches constitutional proportions, we should consider five factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense." Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir. 1990), cert. denied, 498 U.S. 1091(1991).  The Court must then balance the importance of the evidence against the state interest in exclusion.  Id.; Miller v. Stagner, 757 F.2d 988, 994 (9th Cir. 1985)   In so doing, a court must consider the purpose of the rule; its importance; how well the rule implements its purpose; and how well the purpose applies to the case at hand. Stagner, 757 F.2d at

994-995.  The court must give due weight to the substantial state interest in preserving orderly trials, in judicial efficiency, and in excluding unreliable or prejudicial evidence.  Id.

Applying these factors to the state court's exclusion of the Oregon incident, the Court concludes that Petitioner's Due Process rights were not violated by the state court's decision.  The probative value of the Oregon incident on the central issue of consent was de minimis.  Whether Eastlick had endured a sexual assault by her boyfriend Carr in Oregon when he held her against her will for several days to keep her from going to work had negligible relevance on whether the victim suffered a sexual assault at the hands of Petitioner or, conversely, was engaging in "kinky" sex with him.  Moreover, the evidence of the Oregon incident as a prior allegation of sexual assault rested entirely on the hearsay testimony of Buttner as related by the defense investigator Hunter, the only individual to characterize the victim's allegation as one of sexual assault rather than physical assault.  Hunter testified entirely from memory and could provide no corroborating notes or reports.

Given the foregoing, the evidence would have been difficult for the jurors to evaluate.  Additionally, the evidence was merely cumulative of several other episodes of prior allegations of abuse–some sexual, some physical–with which the victim was confronted on cross-examination and which she acknowledged.  In light of all of these circumstances, and especially in light of the highly prejudicial and damaging videotape shown to the jury, it is impossible to conclude that the excluded evidence constituted a major part of the defense.  The mere existence of the one prior accusation that possibly involved sexual assault would not, by itself, have persuaded the jury that the victim was incredible or that the version of events to which she testified at trial was a lie.

Moreover, the state had a significant interest in excluding this evidence. which, as mentioned, was cumulative and whose probative value was clearly outweighed by its potential for misleading or prejudicing the jurors.  See Tinsley, 895 F.2d at 531.  Thus, given the unreliability, the minimal relevance, and the cumulative nature of the proposed testimony, as well as the "wide latitude" given to determinations of state court judges excluding "marginally relevant" evidence, Crane, 476 U.S. at 689-690, the state court's decision to exclude the Oregon incident cannot be said to have rendered the state proceedings so fundamentally unfair as to violate Petitioner's due process rights.  See

1   Tinsley, 895 F.2d at 530; Bueno, 988 F.2d at 87.[3]

2       The Court additionally concludes that even if the state court erred in excluding the evidence,

3   and even assuming, arguendo, that such an error rose to the level of a constitutional violation, the

4   error was harmless constitutional error under Brecht v. Abrahamson, 507 U.S. 619 ("A federal court

5   may grant habeas relief based on trial error only when that error had substantial and injurious effect

6   or influence in determining the jury's verdict."); Calderon v. Coleman, 525 U.S. 141, 119 S.Ct. 500

7   (1998).   The United States Supreme Court has held that the appropriate standard on collateral

8   review for trial errors such as that asserted in Ground One is whether the error resulted in "actual

9   prejudice."  Brecht, 507 U.S. at 622- 623, 638.

10      Petitioner has failed to show actual prejudice resulting from the trial court's exclusion of the

11  prior incident.   The prosecution's primary evidence was the videotape of the sexual assault.  The 5th

12  DCA described the videotape as depicting as "graphic and brutal rape."  (Doc. 9, Exh. A, p. 4.)

13  Indeed, even the transcript of the videotape, though lacking the visual impact of the videotape itself,

14  was nevertheless chilling.  (CT 152-182).  Unquestionably, any reasonable juror would have formed

15  an opinion, based on the provocative nature of the events portrayed in the videotape, as to whether

16  the sexual encounter therein depicted was consensual or not.  The testimony of the victim and

17  Petitioner would only serve the tangential purpose of corroborating the jurors' already-formed

18  impressions regarding guilt or innocence.

19      From this perspective, any excluded evidence tending to impeach the victim in a marginal

20  way could not "actual[ly] prejudice" Petitioner's defense.  Moreover, the state court effectively

21  permitted the jury to hear about all instances of prior sexual or physical abuse allegations by the

22

23          [3]The defense originally sought admission of the Oregon incident pursuant to California Evidence Code § 782, which
24  limits the types of information that can be admitted against a sexual assault victim at trial.  It is possible that the state court
    would have erred in considering the evidence under that section.  See People v. Franklin, 25 Cal.App. 4th 328,  (1994)(holding
25  that evidence relating to sexual conduct is admissible if the sexual conduct itself is not the fact from which the jury is asked
    to draw a credibility reference, but instead from the fact that the witness stated as true something that was false). The state
26  court ultimately excluded the Oregon incident pursuant to California Evidence Code § 352, which provides in part that a
    court, in its discretion, "may exclude evidence if its probative value is substantially outweighed by the probability that its
27  admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing
    the issues, or of misleading the jury."  And, regardless of whether the state court excluded the evidence under § 782 or § 352,
28  this Court's analysis of any potential due process violation stemming from the excluded evidence would be the same and
    would reach the same conclusion.

victim with the sole exception of the Oregon incident.  On cross-examination, defense counsel asked the victim specifically if she had made three such allegations within a seventeen month period and the victim acknowledged that she had.  (RT 347).  In his closing argument, defense counsel maintained that the frequency of such allegations made the victim inherently incredible:

> "A total of three rapes in the course of 17 months.  Now, was Ms. Eastlick being willfully false when it came to that?  I think we all know the answer to that.  It was willful, she was being wilfully false.  Was that material, was that relevant?  It has a lot to do with her credibility."

(RT 778).

Based on the foregoing, Petitioner was given an ample and reasonable opportunity to present this issue to the jury and the addition of the Oregon incident would not have appreciably altered the jury's consideration of the issue as it relates to the victim's credibility.  Under such circumstances, the Court concludes that the trial court's error, if any, in excluding the Oregon incident did not have a substantial and injurious effect in determining the jury's verdict.  Hence, it is harmless.

Based on the foregoing, the Court concludes that the state court's decision regarding this claim was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Ground One must be denied.

**Ground 2.       The trial court violated Petitioner's Sixth and Fourteenth Amendment rights by excluding important character evidence.**

Petitioner alleges that the trial court violated his constitutional rights by excluding evidence of specific instances in which Petitioner, during sexual activity with a female, had respected the female's request either not to have sex or not to continue with sex.  Petitioner's contention focuses the Court's inquiry on the state trial court's decision permitting testimony that Petitioner was not violent during sex but prohibiting testimony as to specific instances in which Petitioner had respected his partner's decision not to proceed with sexual activity.  Ground Two is without merit.

The defense presented four witnesses who testified to Petitioner's character for non-violence and truthfulness.  Stephanie Lynell Stuart, Courtney Dawn Holland, Monica Rodriguez, and Chavonne Benjamin each testified that they were friends of Petitioner and that he was non-violent and truthful by nature.  (RT 536; 540; 556; 571).  Additionally, Holland and Benjamin, both former

sexual partners of Petitioner, testified that, in their opinions, Petitioner was non-violent in a sexual setting.  (RT 540; 571).

While admitting the above testimony, the trial court excluded further testimony by Holland regarding specific occasions when Petitioner complied with her request to discontinue a particular activity, e.g., if Petitioner asked to videotape the couple during sex, or asked Holland to submit to using bondage restraints, or made some other request which Holland declined.  (RT 541-550).  The defense represented to the court that Benjamin, who had been involved in a six year sexual relationship with Petitioner, would testify to similar episodes if counsel were permitted to question her about them.  (RT 549).

The trial court ruled that Petitioner's compliance when the women refused bondage or videotaping was irrelevant to the issue of consent.  (RT 551).  Testimony from Petitioner's former sex partners would be permitted insofar as it related to Petitioner's character for non-violence, even his non-violence in a sexual setting.  (RT 549).  However, the court ruled, such testimony was not relevant insofar as it merely indicated that the women had a sexual relationship with Petitioner and that he had never raped them.  (RT 549).

As with Ground One, the clearly established federal law relating to a state court's exclusion of evidence can be traced back to <u>Crane</u>, 476 U.S. at 687,  and analyzed under the factors set forth in <u>Tinsley</u>, 895 F.2d at 530-531.   Applying the <u>Tinsley</u> factors in this context, the Court cannot conclude that the state court's exclusion of such evidence violated Petitioner's constitutional right to due process.

First, viewed in light of all of the evidence presented at trial, the probative value of the excluded evidence was minimal. As Respondent correctly points out, both Holland and Benjamin testified that Petitioner was non-violent in a sexual setting.  The excluded testimony, regarding specific instances when Petitioner wished to engage in an activity that Holland or Benjamin refused–including videotaping, bondage, and other activities not directly related to sexual contact itself—along with their testimony that Petitioner had respected their wishes, did not have direct relevance to the issue of consent in the charged offenses.  Moreover, as the trial court observed, testimony by former girlfriends that Petitioner did not rape them was not relevant or probative of

whether the actions depicted on the videotape admitted at trial constituted "rough" sex or a brutal rape.

Also, given the testimony by Holland and Benjamin as to Petitioner's character for non-violence in a sexual setting, as well as Rodriguez's and Stuart's testimony that, in their opinions, Petitioner was both non-violent and truthful, the excluded evidence would have added little if anything of value to the quantum of evidence already presented to the jurors regarding Petitioner's positive qualities.

Thus, as was true with Ground One, the evidence excluded can hardly be characterized as comprising a "major part of the attempted defense." The key evidence was the videotape. The testimony of the victim and Petitioner conflicted as to how to interpret that videotape, but both sides presented substantial evidence impeaching the other's credibility and, to an extent, supporting their own credibility. As mentioned, four female witnesses testified to Petitioner's non-violence and truthfulness. If, in sifting through this abundance of character and credibility evidence, the jurors had not already accepted Petitioner's version of events as true and rejected the victim's version, then it is not reasonably likely that the excluded testimony about specific instances in which Holland or Benjamin made a sexual request that Petitioner honored would not have changed jurors' minds.

Although it may be argued that the excluded evidence was reliable and capable of evaluation by the jurors, the other two factors in Tinsley, the clear balance weighs here in favor of the state court's exclusion of this evidence. Tinsley, 895 F.2d at 530-531.

As Respondent correctly notes, this outcome is entirely consistent with the federal standard for excluding specific instances of conduct when eliciting character evidence. In Michelson v. United States, 335 U.S. 469 (1948), the United States Supreme Court explained the vagaries involved in the admission of character evidence as follows:

> What commonly is called 'character evidence' is only such when 'character' is employed as a synonym for "reputation.' The witness may not testify about defendant's specific acts or courses of conduct or his possession of a particular disposition or of benign mental and moral traits; nor can he testify that his own acquaintance, observation, and knowledge of defendant leads to his own independent opinion that defendant possess a good general or specific character, inconsistent with the commission of acts charged."

Id. at 477.

Of course, in California, Evidence Code §§ 1101 and 1102, under which the state court proceeded in this case, permit a wider latitude for admission of specific instances of conduct to support character evidence testimony.  However, the critical point is that, regardless of California's more permissive evidence rules, the exclusion of evidence here did not violate federal standards for admission of evidence and thus does not constitute a violation of Petitioner's federal constitutional rights.

Moreover, even if, arguendo, the state court erred in excluding evidence of specific instances when Petitioner respected the wishes of his partner, any error was harmless because Petitioner has not shown actual prejudice resulting from the trial court's ruling.  Brecht, 507 U.S. at 631.  The combination of prosecution evidence—the videotape, the testimony of the victim, corroborating testimony from independent witnesses about her demeanor immediately after the assault, and the forensic evidence, including the loaded handgun retrieved from Petitioner's bed—all paint a highly convincing picture of Petitioner's guilt.  It is unnecessary for this Court to assess whether the prosecution's case was, as the 5th DCA and Respondent maintain, "overwhelming."  Certainly, it was legally solid and highly persuasive on many levels.  On the other hand, Petitioner's sole line of defense was that the scene depicted in the videotape was, contrary to appearances, actually a form of play-acting about which the victim lied when she testified at trial.  Given the foregoing, it is improbable and highly unlikely that admission of the excluded testimony would have had any significant effect on the outcome of the case.  Thus, the state court's decision to exclude this evidence did not actually prejudice Petitioner and is, therefore, harmless.  Brecht, 507 U.S. at 622-623, 638

For these reasons, the Court concludes that the state court rulings approving the exclusion of this evidence were not contrary to nor an unreasonable application of clearly established federal law.  Accordingly, Ground Two should be denied.

///

///

///

///

**Ground 3.     The trial court violated Petitioner's Sixth and Fourteenth Amendment rights by failing to give CALJIC No. 2.01.**

Finally, Petitioner contends that the trial court should have instructed the jury by giving CALJIC No. 2.01 regarding circumstantial evidence.  As with the other two grounds, this contention is without merit.

A.  Procedural History.

At trial, the state court indicated that it intended to give CALJIC No. 2.01 as to count four, possession of an illegal weapon, but not as to the other four counts.  (RT 726).  The court's rationale was they "all agreed that this was not a case...where the People were relying upon circumstantial evidence...."  (RT 726).  This was true because the primary evidence for the State was the videotape, which the state court accurately characterized as an "eye witness account of the incident," and the testimony of the victim herself, a percipient witness.  (RT 728).  Since instruction No. 2.01 "only applies to cases where the jury is being presented with circumstantial evidence from which they're asked to infer facts and those facts which are inferred [the] prosecutor would be relying upon for binding [sic] of guilt," the instruction was improper as to all counts except that of possessing an illegal weapon, a charge that requires circumstantial proof that the weapon has been illegally modified.  (RT 728). [4]

The Fifth DCA did not expressly address the merits of Petitioner's contention on direct appeal.  (Doc. 9, Exh. A, p. 9).  Rather, the appellate court took the position that, because defense counsel was able to "fully and forcefully" raise and discuss the circumstantial evidence in closing argument, any error in failing to instruct the jury as to the rape charge was harmless.  (Id.).

B.  CALJIC No. 2.01.

CALJIC No. 2.01, provides as follows:

However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.

---

[4] Although defense counsel did not expressly object to the court's decision not to instruct, he did request that, if the court were not going to instruct the jury on No. 2.01 as to all charges,  he should be allowed to argue to the jury that the instruction applied to the rape charge.  (RT 727).  Thus, the issue was properly preserved by a timely objection.

Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt.

Also, if the circumstantial evidence [as to any particular count] permits two reasonable interpretations, one of which points to the defendant's guilt and the other to [his][her] innocence, you must adopt that interpretation that points to the defendant's innocence, and reject that interpretation that points to [his][her] guilt.

If, on the other hand, one interpretation of this evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

CALJIC No. 2.01.

The Use Note to CALJIC 2.01, citing various California cases, indicates that the instruction must be given, sua sponte, by the court when the prosecution rests "substantially or entirely on circumstantial evidence." CALJIC 2.01, Use Note. However, the Use Note cites cases that advise that "[t]his instruction is unnecessary where the prosecution does not substantially rely on circumstantial evidence." Id. Moreover, the comment indicates that "[t]he instruction should not be given when the problem of inferring guilt from a pattern of incriminating circumstances is not present." CALJIC No. 2.01, Comment.

Here, of course, the prosecution's case did not rest "substantially on circumstantial evidence." To the contrary, this Court agrees with the state trial court's assessment that the prosecution's case was primarily comprised of direct evidence, i.e., the videotape of the incident and the victim's testimony. While some circumstantial evidence was admitted on the rape charge, the case did not "substantially rely" on it and, under those circumstances, it would torture logic to construe the prosecution's case as requiring the jury to "infer guilt from a pattern of incriminating circumstances." Accordingly, the state court correctly applied California law in refusing to instruct the jury on CALJIC No. 2.01 as it related to the charge of sexual assault.

C. No Federal Law Violation Occurred.

Petitioner's burden, however, is to establish that the state court's failure to instruct on circumstantial evidence rose to the level of a federal constitutional error. Generally, the issue of whether a jury instruction is a violation of state law is neither a federal question nor a proper subject

for habeas corpus relief. <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991). ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting* <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990); <u>Gilmore v. Taylor</u>, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"). Thus, normally, a claim that challenges the propriety of a jury instruction under state law cannot reasonably be construed to allege a deprivation of federal rights. <u>Van Pilon v. Reed</u>, 799 F.2d 1332, 1342 (9th Cir. 1986). Indeed, federal courts are bound by state court rulings on questions of state law. <u>Oxborrow v. Eikenberry</u>, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989).

A challenge to a jury instruction solely as an error under state law does not normally state a claim cognizable in a federal habeas corpus action. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, the petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. <u>See</u> <u>id</u>. at 72. The constitutional significance of the omission of an instruction will depend upon the evidence in the case and the overall instructions given to the jury. <u>See Duckett v. Godinez</u>, 67 F.3d 734, 745 (9th Cir. 1995); <u>see also Henderson v. Kibbe</u>, 431 U.S. 145, 155 (1977).

Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. <u>Id</u>. The Court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. <u>See United States v. Frady</u>, 456 U.S. 152, 169 (1982), *citing* <u>Henderson v. Kibbe</u>, 431 U.S. at 154. Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, the petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). <u>See Hanna v. Riveland</u>, 87 F.3d 1034, 1039 (9th Cir. 1996).

The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. <u>Henderson v. Kibbe</u>, 431 U.S. at

154. Moreover, an individual such as Petitioner in this case whose claim involves the *omission* of an instruction "bears an especially heavy burden," because an omission is less likely to be prejudicial than a misstatement of the law. Id. at 155.

Here, the instruction was correctly refused under state law as to the rape charge because, as discussed above, the prosecution's case on the sexual assault charge did not "substantially" rely on circumstantial evidence. Nor does federal law require such an instruction. In Holland v. United States, 348 U.S. 121, 139-140 (1954), the Supreme Court considered the practice of instructing the jury in a manner similar to that reflected in CALJIC No. 2.01 and disapproved of the practice. In Holland, the defendants, husband and wife, were convicted of income tax evasion in a prosecution based upon a "net worth" method of proof. Id. at 125. On appeal, the defendants argued that the trial court had erroneously refused to instruct the jury that where the Government's evidence is circumstantial, it must be such as to exclude every reasonable hypothesis other than that of guilt. Id. at 139. While recognizing that some authority existed for such an instruction, the Supreme Court nevertheless went on to conclude that "the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect...." Id.

The Ninth Circuit, discussing Holland, noted the import of the Supreme Court's ruling as follows:

> "The Supreme Court did more than reject the particular instruction before it; it clearly stated that no instruction is to be given distinguishing the manner in which direct and circumstantial evidence are to be weighed. Since circumstantial and testimonial evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is to be required of the jury is that it weigh all of the evidence, direct or circumstantial, against the standard of reasonable doubt."

United States v. Nelson, 419 F.2d 1237, 1241 (9th Cir. 1969).

Here, the jury was instructed that "both direct and circumstantial evidence are acceptable as a means of proof"; that "[n]either is entitled to any greater weight than the other"; that the jury was the sole judge of the believability of witnesses; that the character of the witnesses for honesty or truthfulness could be considered in determining their credibility; that character evidence could be considered in making credibility determinations; and that evidence of Petitioner's good character

could be sufficient to raise a reasonable doubt as to his guilt.  (CT 258; 262-263; 275; 279).  The jury was also fully instructed regarding reasonable doubt and the applicable burden of proof.  (CT 287).  Given the comprehensive instructions regarding the different types of evidence, the credibility of witnesses, and the burden of proof, due process and federal law require no more.  Holland, 348 U.S. at 139.

Consequently, Petitioner has failed to demonstrate that his trial was rendered fundamentally unfair by the state court's failure to instruct on CALJIC No. 2.01.  See McGuire, 502 U.S. at 72; see also Van Pilon, 799 F.2d at 1342.

Moreover, even if the failure to give the instruction were error, it was harmless under Brecht.  Petitioner was given a full and fair opportunity to impugn the victim's credibility, which Petitioner did on numerous occasions throughout the trial and in closing argument.  As the 5th DCA observed,

> "[W]e fail to see how making these arguments louder, as it were, would have changed the outcome in this case.  The jury was entitled to view that tape and conclude that, whatever else may have transpired between [Petitioner] and the victim on other occasions, or between the victim and other people, [the victim] did not consent to [Petitioner's] actions on the night of September 11."

(Doc. 9, Exh. A, p. 10).  Hence, the failure to instruct on CALJIC No. 2.01 did not "actually prejudice" Petitioner, and thus any error is harmless.  Brecht, 507 U.S. at 622- 623, 638.

## RECOMMENDATION

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be DENIED.

This Report and Recommendation is submitted to the United States District Court Judge assigned to the case pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy of this Report and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Report and Recommendation."  Replies to the Objections shall be served and filed within ten (10) court days (plus three days if served by mail)

///

///

after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   **March 20, 2006**                              **/s/ Theresa A. Goldner**
**j6eb3d**                                         UNITED STATES MAGISTRATE JUDGE